[Cite as *State v. Burns*, 2012-Ohio-2536.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.    24174 |
| v. | : | T.C. NO.    10CRB4212 |
| | | 10CRB4265 |
| MAURICE BURNS | : | |
| | | (Criminal appeal from |
| Defendant-Appellant | : | Municipal Court) |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____8th____ day of ____June____, 2012.

. . . . . . . . . .

STEPHANIE L. COOK, Atty. Reg. No. 0067101, Chief Prosecutor, City of Dayton, 335 West Third Street, Room 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

JOHN C. MEEHLING, Atty. Reg. No. 0077630, 1105 Wilmington Avenue, Dayton, Ohio 45420
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

        **{¶ 1}**   Maurice D. Burns was found guilty after a bench trial in the Dayton

Municipal Court of unlawful restraint, sexual imposition, assault, and domestic violence. The charges stemmed from an altercation between Burns and his former girlfriend, Katie.[1] The trial court merged the assault charge with the domestic violence charge, and it sentenced Burns to 180 days in jail for the domestic violence. Burns was also sentenced to 60 days in jail for the sexual imposition and to 60 days in jail (with seven days suspended) for unlawful restraint. For each offense, Burns was given credit for 53 days that he had already spent in jail. With respect to the sexual imposition charge, Burns was designed a Tier I sex offender.

{¶ 2} Burns appeals from his convictions, claiming that the trial court should have granted his Crim.R. 29(A) motion for acquittal for the sexual imposition charge and that all of his convictions were based on insufficient evidence and against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

### I. Facts and Procedural History

{¶ 3} The State's principal witness at trial was Burns's former girlfriend, Katie. Her testimony established the following facts.

{¶ 4} Burns and Katie lived together, on and off, for six years, and they had two young children together. The family lived in a two-story home in Dayton, along with a roommate who lived in a portion of the basement. In May 2010, Burns and Katie had recently ended their relationship, but they continued to reside together while one of them made plans to move out.

{¶ 5} At approximately 12:30 p.m. on May 10, 2010, Burns and Katie got into an

---

[1] For privacy reasons, we will refer to the complainant by her first name.

argument about a text message that Katie had made several weeks before to Burns's employer, which had resulted in Burns's being fired from that job. Burns apparently had just learned about the message, and he began looking through Katie's cell phone. Katie followed him through the house, trying to get her phone back.

{¶ 6} Burns went down to the basement, where he had an office, went into the office, and closed the door. Katie turned off the office light, using the switch on her side of the door. Burns then pushed the door open, causing Katie to stumble. Burns grabbed Katie's shoulders, "threw" her over the side of a couch (which was to the left of the door), resulting in Katie's lying on her back with her legs over the arm of the couch. Burns held Katie down with his hands. Burns told Katie that if she couldn't "leave him alone then he'll give me what I want." Katie understood Burns to mean that he would try to have sex with her.

{¶ 7} Katie began to squirm on the couch and told him to stop. While Burns held Katie down, he pulled her underwear and sweat pants down to her knees. Burns flipped Katie off the couch, so that her knees were on the floor and her face was in the cushions. Burns continued to hold her down with his forearm. Katie was soon able to tell that Burns was naked from the waist down, and she "felt him in his privates touch me." Katie straightened her body and crossed her legs. She squirmed and told him to stop, while Burns tried to separate her legs. Burns then let Katie get up, and she ran upstairs.

{¶ 8} Once upstairs, Katie grabbed a camera and went into the bathroom. She testified, "I knew I hurt so I wanted to see what I could get pictures of." Burns followed her to the bathroom, but soon left. Afterward, Katie photographed scratches on her right leg,

buttocks, and right wrist and hand, as well as a rug burn on her left knee. (These were also photographed later that day by the police.) She testified that her wrists, arms, hands, and legs were in pain. Katie then grabbed her purse and left the house with the intention of going to the police; she testified that Burns still had her phone.

{¶ 9} As Katie drove from the house, she became shaky and started to cry. She pulled into a Walgreens parking lot. After she calmed down, she decided to go back to the house, pack a bag, and get the children before Burns could take them elsewhere, and then go to the police station.

{¶ 10} Katie returned home, went upstairs, and began to put belongings into a duffel bag. Burns came into the room and said to her, sarcastically, "Oh, you are leaving. That's sad." He asked where she was going and how she would get there; he indicated that she would not be permitted to take the car that she usually drove, which was titled in Burns's name. When Katie brought her packed bag downstairs to the living room and was getting ready to gather the children, Burns tried to take her car keys from her shirt pocket. Katie turned away from him, but he wrestled her to the floor, restrained her, and sat on her back. Burns got the keys from her pocket and then called 911. Katie heard Burns tell the dispatcher that he was in a domestic altercation and that he had to restrain Katie because she was being physically aggressive. Katie yelled that Burns had tried to rape her. She repeatedly screamed at Burns to get off of her.

{¶ 11} The police arrived within minutes. Burns called the couple's five-year-old daughter from her bedroom and had her answer the door for the police. Once the police entered, Burns got off of Katie, and she was handcuffed by the police and seated on the

living room couch. A couple of minutes later, the handcuffs were removed, and Katie was taken outside to be interviewed by one of the officers; Burns remained inside the house and spoke with another officer. A female detective came and took photographs of Katie's injuries. (Katie testified that she later developed bruises on her wrists and legs and that she photographed those bruises, but the photos were not provided to the State.) Approximately an hour after the police arrived, Burns was arrested.

{¶ 12} Dayton Police Officers Ferdinand Leal and Officer David Klawon testified at trial that they were dispatched to Burns's residence on a report of a boyfriend/girlfriend dispute. Klawon stated that the complainant reported that the complainant's girlfriend was attacking him and trying to steal his car. When the officers arrived, they heard a woman screaming; they came in the unlocked front door. Upon entering the house, they saw Katie lying on her stomach with Burns sitting on top of her, holding her hands; Katie was crying and screaming, "Get off of me!" Burns told the officers that Katie was out of control. Based on the dispatch report, which had also indicated that Katie was out of control and violent, Officer Leal handcuffed her, stood her up, and had her sit on the couch. Officer Leal testified that Burns was calm.

{¶ 13} Officer Leal spoke with Burns after Katie was taken outside the house by Officer Klawon. Burns did not complain of any injuries, and Leal did not observe any injuries on Burns. Later, Officer Leal took photos of the scratches on Katie's right leg, buttocks, and right wrist; a female officer photographed the rug burn on Katie's buttocks.

{¶ 14} Burns testified on his own behalf. Consistent with Katie's testimony, he indicated that the dispute began when he took Katie's phone in order to transfer contact

information from her phone to his. Katie came downstairs to ask Burns for her phone back, and Burns had responded that she could have it when he was done transferring the contacts. Burns indicated that Katie followed him around the house while he had her phone. He agreed with Katie's testimony that he eventually walked to his office in the basement and closed the door, and that Katie turned off the office light.

{¶ 15} According to Burns, after Katie turned off the office light, he stepped out of his office with the phones, Katie spat on him and called him names, and he went into the kitchen with the phones. While in the kitchen, Burns reminded Katie that she had a meeting from 1:00 to 3:00 p.m. that day. Katie again asked for her phone, and Burns refused to give it to her. Katie cursed at Burns and left for her meeting.

{¶ 16} Burns further testified that Katie returned after 30-45 minutes; at that time, Burns was sitting on the couch with the couple's infant son. Burns saw Katie go upstairs, and he heard drawers opening and closing. Burns went upstairs to see what she was doing, and he asked if she were leaving. Katie did not respond, so Burns went back downstairs. Katie soon came back downstairs, pumped breast milk, and then went upstairs for the bag. When she returned downstairs, Burns told her, "Well if you can't tell me where you're going you have to give me the keys because you are not insured on the car and depending on where you take the car I need to know if you leave." Burns explained that most of Katie's family lived in Columbus, Ohio, and that Katie did not have insurance for the car. Burns saw Katie's car keys sticking out of her pocket, and he grabbed them. Burns took the car key from the key ring and returned the house key to Katie.

{¶ 17} Burns testified that Katie got upset and became violent. He stated that she

was "kicking and swinging" at him, and that he got behind her to stop it. (On cross-examination, Burns acknowledged that Katie did not "make contact" with him when she swung and kicked.) Burns was concerned that they both would be arrested, because they previously had an altercation which led to criminal charges. Burns put Katie "in an arm bar" and called 911. Burns testified that he was not injured by Katie. He testified on cross-examination that, while he waited for the police, he asked his daughter to unlock the front door and then sent her back upstairs.

{¶ 18} Burns described the officers' arrival and their investigation of the incident. Burns stated that he had requested a scraping of his fingernails and expressed concern that Katie had caused the injuries to herself. No fingernail scraping was done.

{¶ 19} Burns acknowledged that he took Katie's cell phone, but he denied that he threw her onto the couch, pulled down her pants, and tried to sexually assault her. Burns further denied that he had caused the injuries reflected in the photographs of Katie.

{¶ 20} Burns was subsequently charged with unlawful restraint, assault, domestic violence, and sexual imposition. After a bench trial, he was convicted of all counts and sentenced, as described above.

{¶ 21} Burns appeals from his convictions, raising three assignments of error. We will address the first and third assignments together.

## II. Sexual imposition charge

{¶ 22} Burns's first and third assignments of error are directed to his conviction for sexual imposition. They state:

THE TRIAL COURT ERRED AS A MATTER OF LAW IN

OVERRULING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO CRIMINAL RULE 29 AND THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE FOR THE CHARGE OF SEXUAL IMPOSITION

THE TRIAL COURT ERRED WHEN IT FOUND DEFENDANT GUILTY OF SEXUAL IMPOSITION, IN CONTRAVENTION OF R.C. 2908.06(B).

{¶ 23}   In his first and third assignments of error, Burns claims that the trial court erred in denying his Crim.R. 29(A) motion for a judgment of acquittal on his sexual imposition charge, and he argues that his conviction for that offense was against the manifest weight of the evidence.   Burns further claims that his conviction for sexual imposition violates R.C. 2907.06(B), which requires corroboration of that offense.

{¶ 24}   When reviewing the denial of a Crim.R. 29(A) motion, an appellate court applies the same standard as is used to review a sufficiency of the evidence claim.  *State v. Thaler,* 2d Dist. Montgomery No. 22578, 2008-Ohio-5525, ¶ 14.   "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."  *State v. Wilson,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.   When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a

reasonable doubt. *State v. Dennis,* 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 25} In contrast to the sufficiency of the evidence standard, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 26} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.

{¶ 27} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d

717.

**{¶ 28}** R.C. 2907.06, the sexual imposition statute, states that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * (1) [t]he offender knows that the sexual contact is offensive to the other person, * * * or is reckless in that regard." R.C. 2907.06(A)(1). "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). The sexual imposition statute further provides, "No person shall be convicted of a violation of this section solely upon the victim's testimony unsupported by other evidence." R.C. 2907.06(B).

**{¶ 29}** The corroboration requirement in R.C. 2907.06(B) "does not mandate proof of the facts which are the very substance of the crime charged." *State v. Economo*, 76 Ohio St.3d 56, 59, 666 N.E.2d 225 (1996). "The corroborating evidence necessary to satisfy R.C. 2907.06(B) need not be independently sufficient to convict the accused, and it need not go to every essential element of the crime charged. Slight circumstances or evidence which tends to support the victim's testimony is satisfactory. The corroboration requirement of R.C. 2907.06(B) is a threshold inquiry of legal sufficiency to be determined by the trial judge, not a question of proof, which is the province of the factfinder." *Id*. at 60.

**{¶ 30}** Burns argues that the trial court should have granted his Crim.R. 29(A) motion and that his conviction for sexual imposition was against the manifest weight of the evidence, because Katie's testimony at trial was unbelievable. He emphasizes that Katie could not describe in detail how Burns held her down on the basement couch, particularly

while allegedly lowering his pants. He further emphasizes that the police officer's photographs of the basement did not show the area in disarray, and that Katie could not explain why the coffee table had not been disturbed during the alleged assault. Burns also argues that Katie should have had marks or redness on her face from having her face pressed into the couch, and he asserts that Katie could have inflicted her injuries on herself during a short time period that she was alone in the house during the officer's investigation. Finally, Burns asserts that he could not be convicted of sexual imposition, because there were no corroborating witnesses, DNA evidence, or physical evidence.

{¶ 31} In this case, Katie testified that Burns threw her onto the basement couch and threatened to touch her sexually. She described how Burns pulled down her pants and underwear while she squirmed on the couch, how he then turned her over so that her knees were on the floor and her face was in the cushions, and how she felt his bare "privates" touch her in an attempt to have intercourse with her. Katie testified that she told Burns to stop and that she straightened her body and crossed her legs in order to prevent him from penetrating her. Katie further testified that Burns tried to uncross her legs and separate them. The State presented photos of a rug burn on Katie's left knee, and scratches on her right leg, buttocks, and right wrist and hand.

{¶ 32} Katie's testimony, if believed, was sufficient to prove beyond a reasonable doubt that Burns had sexual contact with Katie when he knew that the sexual contact was offensive to her. The photographs of the scratches and the rug burn tended to support Katie's description of the assault and, thus, were sufficient to satisfy the corroboration requirement of R.C. 2907.06(B). The trial court did not err in denying Burns's Crim.R.

29(A) motion.

{¶ 33} Moreover, Burns's conviction for sexual imposition was not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given to their testimony were matters for the trial court, as the trier of fact, to determine. The trial court did not lose its way simply because it chose to believe the State's version of the events, which it had a right to do.

{¶ 34} The first and third assignments of error are overruled.

### III. Unlawful Restraint, Domestic Violence, and Assault

{¶ 35} Burns's second assignment of error states

THE TRIAL COURT ERRED WHEN IT FOUND DEFENDANT GUILTY OF UNLAWFUL RESTRAINT, DOMESTIC VIOLENCE, AND ASSAULT, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} In his second assignment of error, Burns claims that his convictions for unlawful restraint, domestic violence, and assault were against the manifest weight of the evidence. Although not a part of his assignment of error, he further argues that the State failed to present sufficient evidence to support these convictions, because Katie's testimony was not credible.

{¶ 37} Katie testified at trial that she and Burns had two children together, and that they had lived together, on and off, for six years. During their altercation on May 10, 2010, Burns pushed Katie onto the basement couch and held her down while he attempted to sexually assault her. Katie testified that her wrists, arms, hands, and legs were hurt by Burns's action, and the State presented evidence that Katie was scratched and sustained a rug

13

burn during Burns's attack. Katie further testified that Burns later wrestled her to the floor, held her arms so that she couldn't move, and sat on her until the police arrived. Officers Leal and Klawon observed Burns's pinning Katie on the floor and heard Katie crying and screaming at Burns to get off of her.

{¶ 38} Construed in the light most favorable to the State, the State's evidence was sufficient to prove that Burns committed domestic violence, assault, and unlawful restraint. Moreover, his convictions did not constitute a manifest injustice, and the trial court did not lose its way when it chose to credit that State's evidence. Burns's convictions for domestic violence, assault, and unlawful restraint were not against the manifest weight of the evidence.

{¶ 39} The second assignment of error is overruled.

### IV. Conclusion

{¶ 40} The trial court's judgment will be affirmed.

. . . . . . . . . .

GRADY, P.J. and HARSHA, J., concur.

(Hon. William H. Harsha, Fourth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Stephanie L. Cook
John C. Meehling
Hon. Daniel G. Gehres